**INNIS ARDEN GOLF CLUB, Plaintiff,**

**v.**

**PITNEY BOWES, INC., et al., Defendants.**

**Civil No. 3:06cv1352 (JBA).**

United States District Court, D. Connecticut.

June 26, 2009.

Erin Arcesi Mutty, Jeffrey R. Martin, Michael D. O'Connell, Robert B. Flynn, O'Connell, Flaherty & Attmore, Hartford, CT, Robert W. Allen, Tyler, Cooper & Alcorn, LLP, New Haven, CT, for Plaintiff.

Brent A. Fewell, Hunton & Williams, Washington, DC, Gustavo Membiela, Marty Steinberg, Rafael R. Ribeiro, Hunton & Williams LLP, Miami, FL, Jonathan M. Shapiro, Richard P. Colbert, Sarah Frances Depanfilis, Day Pitney LLP, Stamford, CT, Francis J. Brady, Loni S. Gardner, Sarah P. Kowalczyk, Murtha Cullina LLP, Hartford, CT, Jennifer Morgan Delmonico, Murtha Cullina LLP, New Haven, CT, for Defendants.

## RULING ON DEFENDANTS' *DAUBERT* MOTIONS, DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, AND REMAINING MATTERS

JANET BOND ARTERTON, District Judge.

In 2004, Plaintiff Innis Arden Golf Club ("Innis Arden" or "IAGC") discovered that its property was contaminated with organic pollutants identified as polychlorinated biphenyls ("PCBs"). Innis Arden hired an environmental-consulting firm, O'Brien & Gere ("OBG"), to investigate and coordinate the elimination of the PCB contamination, and then brought this civil action against the owners and operators of several nearby properties to seek reimbursement for the costs of this remediation. In its second amended complaint, Innis Arden asserts a private cost-recovery claim pursuant to § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, seeks equitable relief and reimbursement pursuant to Connecticut Gener-

al Statutes §§ 22a–16 and 22a–452, and alleges common-law nuisance and trespass.

With its case in the final stages before trial, however, Innis Arden faces several critical problems. The two remaining Defendants, Pitney Bowes, Inc. ("Pitney Bowes") and Pateley Associates 1, LLC ("Pateley"), contend that Innis Arden has failed to comply with its discovery obligations, thereby prejudicing their ability to mount a defense and to scrutinize the opinions of the two expert witnesses Innis Arden offers to establish causation. Moreover, the Defendants argue that this expert testimony is unreliable and thus inadmissible. Finally, the Defendants move for summary judgment on multiple grounds, including that there is no genuine issue of material fact as to whether they can be held liable for causing the PCB contamination on Innis Arden's property and the remediation costs Innis Arden incurred.

Having examined the voluminous record and given due consideration to all of the parties' arguments, the Court finds that, like pieces to a jigsaw puzzle, the remaining issues in this litigation fit together in only one way. The evidence in the record shows that the challenged expert testimony is unreliable for two independent reasons: (1) Innis Arden's experts failed to account for obvious alternative explanations in reaching their conclusions regarding the cause of the PCB contamination; and (2) based on Innis Arden's conduct presuit and during discovery and the flawed methodologies of its experts, those experts' opinions cannot be tested or verified. And with this evidence found inadmissible, Innis Arden has no proof that the PCBs on its property can be causally linked to the Defendants. Lacking evidence of causation, Innis Arden's claims must fail, and so the Defendants are entitled to summary judgment.

## I. Background

At its core, Innis Arden's case is a cost-recovery action under § 107 of CERCLA. Section 107(a) provides that, where there has been a "release" or "threatened release" of a "hazardous substance" from a "facility" which "causes the incurrence of response costs," a private party may recover the "necessary costs of response incurred ... consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). The general factual background to this case is described in the numerous rulings issued by this Court and by Magistrate Judge Joan Glazer Margolis, to whom the case was referred for discovery and other pre-trial matters. *See, e.g., Innis Arden Golf Club v. Pitney Bowes, Inc.,* 541 F.Supp.2d 480, 486 (D.Conn.2008) (granting Defendants' motions to strike Innis Arden's jury demand); *Innis Arden Golf Club v. Pitney Bowes, Inc.,* 514 F.Supp.2d 328, 339 (D.Conn.2007) (granting in part and denying in part Defendants' motions to dismiss).

As described more fully in the Court's recent ruling sanctioning Innis Arden for spoliation of evidence, OBG investigated the PCB contamination on Innis Arden's property by taking soil samples and then analyzing those samples in the laboratory. *See generally Innis Arden Golf Club v. Pitney Bowes, Inc.,* 257 F.R.D. 334, 335–39 (D.Conn.2009) (the "spoliation ruling"). OBG took samples from three primary areas of Innis Arden's property, which the parties term the "swale," the "upper pond," and the "wetland," and OBG also took and analyzed samples from Pitney Bowes's property on Barry Place. By then comparing the chemical profile of the PCBs found on both properties, OBG sought to correlate the contamination on Innis Arden's property to a source topographically up-gradient from the swale, pond, and wetland. This ruling focuses on

the evidence Innis Arden relies on to prove that the PCB contamination on its property is attributable to the Defendants.[1]

## A. Dr. Kaczmar

Innis Arden retained Dr. Swiatoslav Kaczmar as an expert witness to provide an opinion on the likely source of PCBs found on its property. Kaczmar is a shareholder and chief scientist at OBG who has two graduate degrees in environmental chemistry and toxicology and has extensive experience in the investigation and remediation of hazardous waste. Kaczmar produced an expert report in this case in which he summarized his conclusion that Innis Arden's remediation costs were caused by releases of PCBs from Pitney Bowes's adjacent property on Barry Place.

Specifically, based on his analysis of the chemical composition of the PCBs—which are categorized by commercial designations known as "Aroclors"—and the topography of the Innis Arden property and the surrounding area, Kaczmar opined that "[t]he swale, wetland, pond and other areas of IAGC receiving drainage from Pitney Bowes became contaminated by PCBs from an offsite source." (Kaczmar Rep. ¶ 11.) Based on the PCBs detected "in surface soils and subsoil of the Pitney Bowes property," the drainage patterns of surface water, the "[l]aboratory reports and chromatograms of [soil] samples from the Pitney Bowes and IAGC properties," the relative PCB concentrations on the two properties, and the "fingerprint" of the PCBs, Kaczmar concluded that "Pitney Bowes served as a source of PCBs to the IAGC property." (Id. ¶¶ 14–19.) Of particular importance was the chemical fingerprinting, which, according to OBG's analysis, established that "[t]he majority of samples from both [Pitney Bowes's and Innis Arden's] properties exhibit a PCB profile primarily comprised of a mixture of Aroclors 1248 and 1260." (Id. ¶ 16.)

Kaczmar also concluded that the PCBs traveled down-gradient from Barry Place to Innis Arden's property by way of the "direct runoff" and "storm water conveyance" of "[s]urface water and associated solids." (Id. ¶ 5–8.) In his report, Kaczmar detailed the nature and scope of Innis Arden's remediation efforts and noted that the Pitney Bowes property has the "potential to recontaminate the IAGC property" and put "humans and wildlife" at risk of exposure. (Id. ¶¶ 20–35.) Kaczmar cautioned, however, that the contamination occurred over a long period of time:

> The presence of PCBs in subsurface (deep) as well as surface sediments in the IAGC wetland, swale and pond indicate that the PCBs detected were not the result of a single or short-term event, but likely were released onto IAGC property over a period of time which could be in excess of 30 years.

(Id. ¶ 4.)

Kaczmar then elaborated on his conclusions and the bases for his opinions in his deposition testimony, taken in two stages on February 26 and March 4, 2009. Counsel for Pitney Bowes first questioned Kaczmar about the evidence he relied on to

---

**1.** From 1967 to 2009, Pitney Bowes occupied property located on Barry Place and adjacent to Innis Arden's property. For some of this time, Pateley (and related entities) owned the Barry Place property and leased it to Pitney Bowes. Pitney Bowes and Pateley are involved in a separate action before the Court, *Pateley Assocs. LLC v. Pitney Bowes, Inc.*, No. 3:08cv1607, regarding the PCBs found on the Barry Place property and also concerning whether Pitney Bowes has a duty to defend and indemnify Pateley in this case. But with respect to the issues now before the Court, Pateley has joined Pitney Bowes's motions (*see* Pateley's *Daubert* and Spoliation Mot. [Doc. # 426]; Pateley's Mot. Summ. J. [Doc. # 471] ), and so their positions and arguments will be taken together where appropriate.

form his conclusion that the PCB contamination is traceable to Barry Place. Kaczmar testified that, in the time since he wrote his expert report, he has "become aware of additional information which [he] considered." (Kaczmar Dep., Vol. I, Feb. 26, 2009, at 9:17–19.) But he issued no supplemental expert report. (*Id.* at 10:19–11:4.) Moreover, Kaczmar admitted and then reiterated that there were many documents and materials that he relied on but did not—and indeed could not—specifically identify:

> Q. Just to clarify for the record, because all of the defendants have a right to know, are you saying that there are documents and other references you have relied upon to issue your reports that are not identified in your report or the attachments.
>
> A. Yes.

(*Id.* at 11:5–14:12, 58:5–11.)

Compounding the problem created by the lack of specificity about what materials he reviewed in reaching his conclusions, Kaczmar could not point to what underlying data he consulted. Counsel inquired about the appendix to Kaczmar's expert report, in which he listed various documents he relied on and cited, for example, "Six Laboratory reports for samples collected by OBG at IAGC and Pitney Bowes" from "6/22/05 through 7/12/05." (*Id.* at 24:7–25:3.) When asked how "the defendants or the court [would] know what samples, chromatograms or data packs [he was] referring to" based on this vague description, Kaczmar was unable to respond, claiming instead that the Defendants could determine which particular data he considered because the Defendants "were provided copies of everything." (*Id.* at 25:4–26:18.) Counsel asked Kaczmar similar questions about his other non-specific descriptions of pertinent laboratory reports, but Kaczmar provided no clearer

answer, despite his acknowledging that the actual underlying laboratory reports could have been identified by their classification numbers but were not. (*Id.* at 29:12–40:13.) After interminable sparring with counsel, Kaczmar conceded that he could not point to any particular sample, chromatogram, or data pack that he relied on in forming his opinions about the PCB contamination on Innis Arden's property. (*Id.* at 43:19–44:22, 46:10–47:22.)

Counsel for Pitney Bowes then asked Kaczmar a series of questions about the scope of OBG's investigation. Critically, Kaczmar testified that he and his firm did not test any other nearby properties up-gradient from Innis Arden for PCBs. (*Id.* at 92:16–12, · 119:10–14.) Kaczmar said that he did not fully review the public records and topographical information regarding the properties of Stamford Wrecking Company, Metro–North Commuter Railroad ("Metro–North"), or Global Development Enterprises. (*Id.* at 94:6–98:4.) In particular, Metro–North, which operates rail lines adjacent to and up-gradient from Innis Arden, was the subject of a long exchange between Kaczmar and counsel for Pitney Bowes. Kaczmar mentioned the fact that there is an outfall, variously termed the "Metro–North outfall" or the "Pitney Bowes outfall," that "drains both Pitney Bowes and Metro–North." (*Id.* at 101:20–102:9.) When pressed, Kaczmar admitted that this combination of sources made it impossible to determine where contamination in the outfall originated:

> Q. Can you tell specifically that the PCBs that went into the IAGC property came specifically from the Pitney Bowes outfall?
>
> A. Based on—
>
> Q. Based on the evidence from the outfall.
>
> A. Which evidence?

Q. Doctor, can you answer the question or not?

A. No. This is important.

Q. Can you answer the question or not because we will move to compel your testimony and ask you to appear again. You're avoiding the answer and you have been since we started....

A. On any single result on an outfall, you cannot tell the source when you have multiple contributors to that discharge.

Q. Does that apply to the Pitney Bowes outfall?

A. Yes.

(*Id.* at 107:22–109:5 (objections omitted).)

Moreover, OBG did not take any samples from Metro–North's property for PCB analysis, despite Kaczmar's recognition that PCBs can originate in equipment found in rail yards:

Q. What, if anything, did you do to test the Metro–North property, the rail tracks, the rail yards, the trains? What did you do? ...

A .... I am not aware of any sampling that was performed on Metro–North property.

Q. Are you aware that Metro–North refused to permit [OBG] to sample on their property?

A. No, I am not aware.

Q. Then why didn't [OBG] go on to Metro–North's property and sample?

A. I don't know....

Q. If your company was permitted to take tests of Metro–North, if there was no objection, wouldn't you have wanted to see whether there were PCBs on Metro–North's property and in what concentrations and what aroclors?

A. There's a host of things I would have liked to have seen....

Q. If you're rendering an expert opinion as to the source of PCBs, wouldn't you want to see if there were PCBs in certain concentrations and certain aroclors on a contiguous property?

A. That information would be useful.

Q. It would affect—it could affect your opinion, correct?

A. Depending on what information provided, yes.

Q. If those concentrations were significant and they had aroclors 1248 and 1260, that could affect your opinion, right?

A. Yes, it could.

Q. But that wasn't done, correct?

A. I don't believe so.

Q. Can you tell me why it wasn't done?

A. No, I can't.

(*Id.* at 114:8–118:12 (objections omitted).) And even though internal OBG documents indicated that sampling on other locations would be wise, Kaczmar testified that he was not "personally aware of anything that was done to prove or disprove the railroad as the source of PCBs on IAGC." (*Id.* at 127:5–9.)

Additional deposition testimony revealed that Kaczmar recognized flaws in several other aspects of his methodology. Kaczmar confirmed that OBG used "carbon traps" to test for organic compounds around the Metro–North outfall, but did not properly test the concentration of PCBs in the flowing water. (*Id.* at 131:5–18.). According to documents disclosed in discovery, Innis Arden and OBG expressed concern about the age of the PCBs given the depth of some of the contamination, yet neither Kaczmar nor anyone else dated the samples—for example, by evaluating the sediment for the presence of radioisotopes traceable to pre–1967 atmospheric

nuclear testing. (*Id.* at 143:22–148:9.) Kaczmar cited the excavation of a storage tank near "building 3" on Pitney Bowes's property as an example of a "catastrophic" event capable of releasing PCBs, but admitted that he had no evidence that the PCBs on Innis Arden's property were linked to that excavation. (*Id.* at 197:3–226:24.) Kaczmar further acknowledged that he did not fully investigate the impact of hazardous-waste spills on nearby properties (*id.* at 152:2–155:4), the relative prevalence of PCBs in the local environment (Kaczmar Dep., Vol. II, Mar. 4, 2009, at 17:3–19:8, 219:11–14), or the possibility that the PCBs in the swale, pond, and wetland were caused by Innis Arden's own activities (*id.* at 192:5–193:18). Kaczmar conceded that OBG's laboratory analyses generated incomplete data packages which consequently made it "difficult" for "a third party or a defendant or the court" to replicate or verify the laboratory's work. (*Id.* at 42:18–59:14.)

Finally, Kaczmar reiterated that his responsibilities as an expert did not extend to looking for other potential sources of the PCBs found on Innis Arden's property. Referring to OBG correspondence dated June 2006, counsel asked Kaczmar about his consideration of other potential sources of PCBs:

Q. What did you do to eliminate possibility number 3 [mentioned in the letter], that the PCBs originated on another up-gradient property which then discharged through [the] Pitney Bowes property? You or your company?

A. I don't know what—I don't know the specific things that [OBG] did on those . . . points. I reviewed the information that I had at the time of my opinion. I provided an opinion as to the likelihood of Pitney Bowes acting as a source of contamination to the property.

Q. If you didn't have data from the other sources, you couldn't make that determination, could you?

A. Yes, I could.

Q. You could?

A. Yes.

Q. Without test results or anything else?

A. Yes. Basically I presented a conclusion and an opinion as to the likelihood of the PCBs on the Pitney Bowes property acting as a source to—a source of contamination to the IAGC property such that there was PCB on that property.

Q. But I asked you how you eliminated the third possibility [that] PCBs originated on another up gradient property which then discharged through Pitney Bowes property. What did you do to eliminate that possibility?

A. I told you that I did not work through the elimination of all properties. . . . I provided an opinion, not a conclusion that said there are high concentrations of PCBs on the Pitney Bowes property. They are in certain characteristic aroclors and that there also were high concentrations of PCBs on the Innis Arden property of similar character and based on the other physical features and the historic factors I took into consideration, I concluded that the Pitney Bowes property was acting as a source and likely a very significant source of contamination to the Innis Arden golf course. That was my opinion.

Q. Where did the PCBs on the Pitney Bowes property . . . come from?

A. I don't know. . . .

Q. . . . Did you perform any test of any other property or area to determine

whether they could have caused that amount of contamination from other properties?

A. I had no information indicating the presence of PCBs on other properties. So I didn't have a value to compare it to such as the one I compared to in my statement that says this concentration is within the range of PCBs detected in the soils.

Q. Are you saying that you had no information about PCBs on any other property?

A. Of—correct.

(*Id.* at 178:18–219:10.)

### B. Dr. Pignatello

Innis Arden also retained a second expert, Dr. Joseph Pignatello, an environmental scientist with a Ph.D. in chemistry from the University of California. According to his engagement letter, Pignatello was retained specifically "to review the materials which have been generated in connection with the PCB contamination on Innis Arden's property" and to determine "with a reasonable degree of scientific certainty [whether] some or all of the PCB contamination came on to Innis Arden's property from the adjacent property of Pitney Bowes." (Allen Letter, Nov. 13, 2007, at 1.) Pignatello produced a short written report in January 2008. His conclusions as an expert, given in four paragraphs, were as follows:

PCBs were found in significant concentrations in the drainage swale, the wetlands adjacent to the drainage swale, and the Upper Pond of Innis Arden[, which] is consistent with release of PCBs beginning many years ago ... [and] indicates that releases may have occurred until a time relatively recent to the sampling time.

While there may have been multiple sources contributing to PCB contamination of IAGC, and given that IAGC itself was not a source, it is more likely than not that a direct source of some, if not most, of the PCBs contaminating the IAGC property was the Pitney Bowes (PB) property at 23 Barry Place.

PCBs were found in soil borings from several locations on the PB property ... [and] could have entered IAGC property from PB property via multiple routes....

The Aroclor pattern observed in samples from the two sites is also consistent with the PB property as a source of PCBs to the IAGC property. Chromatograms of samples from IAGC show in nearly all cases a pattern that is characteristic of Aroclor 1260 or a combination of 1260 and 1248. Chromatograms of samples from PB show in the majority of cases a pattern characteristic of 1260 or a combination of 1260 and 1248, although other Aroclors may be represented in some samples from some areas....

(Pignatello Rep. at 1–2.)

Through his subsequent deposition testimony, Pignatello established that he reached his expert conclusions by relying on the same general methodology and underlying data as Kaczmar. (Pignatello Dep., Feb. 25, 2009, at 23:17–25.) Like Kaczmar, Pignatello was unable to identify any particular soil samples or analytical data that he considered in forming his opinions. (*Id.* at 35:6–36:3.) Pignatello testified that he was told by Innis Arden's counsel that he "didn't have to go into the details" of what data he considered, and he further admitted that he was instructed not to bring any of his detailed notes to the deposition:

A. ... I could point out the samples that I looked at. I would have to cross check that with my notes at home when I take a look at the deposition transcript here to make

sure they were accurate, but I can do that.

Q. You have detailed notes you have taken?

A. Yes.

Q. You haven't produced them to us.

A. Some of these notes I have. Some of them, I haven't. . . .

Q. Why didn't you bring your notes with you this morning?

A. I was told not to bring anything.

Q. Who told you that?

A. [Plaintiff's counsel] Rob Flynn, except for the maps.

Q. How did you expect to testify in detail without bringing your notes with you?

A. That's a good question.

(*Id.* at 36:19–38:23.) Throughout his deposition, Pignatello acknowledged that he could not specifically identify the data he considered, other than to say that he received only a subset of the total sampling data. (*Id.* at 44:22–45:8, 104:9–105:16, 127:17–21, 183:24–184:16.)

Pignatello also testified that—again, like Kaczmar—he recognized the potential relevance of dating the soil samples but did no such analysis (*id.* at 50:9–53:15), he understood that the Innis Arden PCBs could have originated on other properties but did not pursue that possibility (*id.* at 63:16–65:19), he was aware of the flaws in linking the PCBs to a release from Pitney Bowes's building 3 (*id.* at 65:20–78:24), and he did not fully consider environmental or atmospheric sources of PCBs (*id.* at 182:20–23). Rather, Pignatello's conclusions did not incorporate "information on PCB contaminants from other properties" even though he testified that "it is quite possible that other properties could have contributed to the contamination on the golf course." (*Id.* at 64:21–65:8.) When asked about potential PCB contamination

from other properties, Pignatello responded:

A. ... I don't have any information on PCBs on any other site, so I can't really comment on that.

Q. But you never looked for it, right?

A. I was told that the information wasn't available.

(*Id.* at 78:14–19.)

## II. Procedural Context

Several pending matters are now before the Court.

### A. Failure to Preserve Relevant Evidence

On May 21, 2009, the Court granted the Defendants' motions seeking sanctions against Innis Arden for spoliation of evidence. The Defendants contended that Innis Arden breached its duty to preserve relevant evidence by destroying the soil samples and failing to fully retain the analytical data and associated materials, despite recognizing that this evidence was highly relevant to the anticipated cost-recovery litigation. The Court agreed, and sanctioned Innis Arden in the spoliation ruling as follows:

Innis Arden knew that OBG's investigation sampling was a critical part of possible cost-recovery litigation, and the duty to preserve this evidence attached at the latest by mid–2005, by which time counsel was actively involved in the investigation and analysis of the samples in preparation for legal action against Pitney Bowes and other parties. Nonetheless, as [OBG vice president Steven] Roland confirmed in his deposition, all the samples were destroyed shortly after the completion of PCB analysis, and the electronic records of the PCB analyses similarly were not preserved. . . .

Therefore, the Court concludes that the undisputed evidence shows that Innis

Arden breached its duty to preserve its sampling evidence and associated data. . . .

While the Court finds no basis on which to conclude that Innis Arden purposefully destroyed evidence to advantage it or disadvantage Pitney Bowes, the consequences of the loss of this evidence are significant and cannot be adequately remedied through applying an adverse inference. . . . For all these reasons, in the Court's view, the appropriate sanction to adequately address the harm suffered by Pitney Bowes, penalize Innis Arden, and deter future destruction of evidence is preclusion of evidence based on the soil samples Innis Arden took from its own property and subsequently destroyed.

257 F.R.D. at 340, 341, 343.

Innis Arden moves for reconsideration of this ruling, arguing that its duty to preserve this evidence was discharged by giving notice to the Defendants, that the Court misapplied authority from the Second Circuit, that the Court erred in finding that Innis Arden disposed of the sampling data, and that the sanction should be lifted or at least reduced. The Defendants object, contending that Innis Arden is merely attempting to relitigate issues already considered and decided.

## B. Sanctions for Discovery Abuse

Shortly after this Court imposed sanctions, Magistrate Judge Margolis issued a ruling granting Pitney Bowes's motion for sanctions based on Innis Arden's conduct during discovery. (Ruling on Def.'s Mot. for Sanctions [Doc. # 515] at 3 (the "sanctions ruling")).) In this ruling, Magistrate Judge Margolis thoroughly documented Innis Arden's "pattern of belated production" and "progressive and wholly untimely supplementation of discovery," which she found to be "the most egregious discovery abuse observed" in her twenty-four years

on the bench. (*Id.* at 5–7, 14.) Specifically relevant here, Magistrate Judge Margolis detailed how Innis Arden (1) failed to fully disclose the documents referenced in its expert reports, (2) produced 6,000 pages of documents shortly before the expert's depositions, (3) produced more than 400 pages of documents on the second day of Kaczmar's deposition, (4) continued to produce discovery material after Kaczmar's deposition and just before the deadline for Pitney Bowes's expert reports, and (5) disclosed additional documents even after the Defendants had filed their motions for summary judgment. (*Id.* at 4–8.) This discovery misconduct, Magistrate Judge Margolis found, was "extremely prejudicial" to the Defendants because it was "impossible . . . to determine whether [Kaczmar and Pignatello] considered the electronic data produced" and because the Defendants consequently were denied "the opportunity to challenge" the experts' conclusions. (*Id.* at 11–12 (quotation marks omitted).) Although she imposed only monetary sanctions, Magistrate Judge Margolis found that "[t]he prejudice suffered is so substantial that a remedy as severe as preclusion of the expert[s'] testimony would be appropriate." (*Id.* at 13–14.)

Claiming that the sanctions ruling is reviewed under a *de novo* standard, Innis Arden objects to essentially every aspect of the ruling. Innis Arden argues that its experts sufficiently identified the materials they considered, that the late disclosures of documents were not "new" because the documents were duplicates of materials previously produced, that the Defendants had all the information needed to cross-examine the experts' conclusions, and that the Defendants have not been prejudiced by the manner in which Innis Arden produced documents. The Defendants respond by arguing that Innis Arden has applied the wrong standard of review and

that the sanctions imposed were entirely appropriate and, if anything, did not go far enough.

## C. *Daubert* Motions

The Defendants have moved to preclude Kaczmar and Pignatello from testifying at trial on the ground that their opinions and methodologies fail to meet the standard for admissibility under Federal Rule of Evidence 702 and the *Daubert* trilogy. Specifically, the Defendants contend that Innis Arden's proffered expert testimony is incomplete and unscientific, based on insufficient foundation and data, and incapable of being tested or verified. Innis Arden contends that its experts have produced reports which meet the threshold test of reliability and that the Defendants' objections are matters for cross-examination at trial.

## D. Motions for Summary Judgment

Finally, the Defendants have moved for summary judgment on several grounds. Their position is that Innis Arden has failed to meet its *prima facie* burden on its CERCLA claim because the response costs were not incurred in compliance with the national contingency plan, because the Defendants are not potentially responsible parties, and because Innis Arden cannot prove causation. Furthermore, the Defendants contend that Innis Arden's claims under Connecticut law must fail for the same reasons. Innis Arden opposes summary judgment by contesting each of these grounds, pointing to, among other things, the expert opinions of Kaczmar and Pignatello.

## III. Applicable Causation Standard

The thread that ties all of these matters together is the question of whether Innis Arden has introduced sufficient evidence to prove causation. The parties disagree, however, over what the governing causation standard is under § 107 of CERCLA.

In the Second Circuit, a CERCLA plaintiff establishes a *prima facie* case under § 107 by offering evidence that

(1) the defendant is within one of the four categories of responsible parties enumerated in § 9607(a); (2) the ... site is a facility as defined in § 9601(9); (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the national contingency plan.

*B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2d Cir.1996). But because CERCLA is a "strict liability" statute, Innis Arden maintains that "the burden of proof as to causation in a CERCLA case lies with the defendant." *Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n,* 66 F.3d 669, 681 (4th Cir.1995). Thus, "it is 'not required that the [plaintiff] show that a specific defendant's waste caused incurrence of clean-up costs.'" *Betkoski,* 99 F.3d at 514 (quoting *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 721 (2d Cir.1993)).

■ The Defendants convincingly argue, however, that Innis Arden has failed to account for the fact that this is a "two-site" case, involving contamination on one property allegedly caused by a release of contaminants on an adjacent property. Defendants cite the Sixth Circuit's views on this point:

In a "two-site" case such as this, where hazardous substances are released at one site and allegedly travel to a second site, in order to make out a prima facie case, the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up.

*Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir.1999). Support for this principle can be found in the text of § 107, which provides in part that liability attaches based on a "release, or a threatened release which causes the incurrence of response costs." 42 U.S.C. § 9607(a)(4). The *Kalamazoo* panel further relied on *Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1382 (W.D.Mo.1994), a complicated case involving groundwater TCE contamination. The litigation began as a class action, but was later expanded to include third-party claims by FAG Bearings against the operators of other nearby facilities. *Id.* at 1384–86. Endeavoring to "discern the role of causation under 42 U.S.C. § 9607" under these circumstances, the district court reasoned:

> The element of "causation" in CERCLA suits has rarely been addressed because the "release" of the hazardous waste is almost always at the same site that has been contaminated. Congress adopted strict liability in these situations. It is not necessary to connect the actual waste disposed of at a site to the waste actually released.... The connection is presumed. One whose waste is disposed of at a site is presumed to be jointly and severally liable for the entire contamination at a site. This is so in the overwhelming majority of cases.
>
> Use of the strict liability presumption ... without modification would hold liable anyone who released the same type of substance that has contaminated another site. A party who discovers TCE groundwater contamination in Missouri could successfully sue every party who released TCE in the entire country. Although CERCLA's liability provisions are far-reaching, there is no indication that Congress intended this absurd result.

*Id.* at 1386–87 (citations and footnote omitted). In *Acushnet Co. v. Coaters Inc.*, the district court used similar language to reject the notion that a plaintiff need not prove causation:

> Under Plaintiffs' legal theory, as long as any response costs are being incurred by a plaintiff, any party that disposed of any hazardous substance is liable to compensate that plaintiff. It does not matter what type or amount of hazardous substance was disposed of by the party. Any hazardous substance in any quantity will open the floodgates of liability, and will do so even if the hazardous substance disposed of by the party is not causing any harm, is not threatening to cause any harm, and is not any part of the reason a response is needed and costs of that response are incurred.... Plaintiffs' theory is not supported by statute, by precedent, or on policy grounds consistent with statutes and precedents.

937 F.Supp. 988, 993 (D.Mass.1996)

Other courts confronted with an issue of causation as framed in this manner similarly recognize that a plaintiff must provide some evidence linking its response costs to the targeted off-site release of contaminants. *See, e.g., White v. County of Newberry*, 985 F.2d 168, 174–75 (4th Cir.1993) (requiring plaintiffs to prove "a release or threatened release of a hazardous substance from the County's maintenance facility that caused the Whites to incur response costs consistent with the national contingency plan"); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459–60 & n. 3 (1st Cir.1992) (affirming the district court's focus "on whether Cumberland somehow, or in some way, caused Dedham to incur response costs" and noting that "without an affirmative finding of fact causally connecting these costs to a threat posed by [Dedham], [Cumberland's CERCLA] claim is necessarily stillborn"); *Amoco Oil Co. v. Bor-*

*den, Inc.*, 889 F.2d 664, 670 (5th Cir.1989) ("[T]he question of whether a release has caused the incurrence of response costs should rest upon a factual inquiry into the circumstances of a case and the relevant factual inquiry should focus on whether the particular hazard justified any response actions.").

But regardless of the terms of the parties' disagreement over the contours of the governing legal standard, Innis Arden's description of its own evidence demonstrates that it understands the necessity of proving a release from Barry Place that caused its response costs. In its brief in opposition to summary judgment, Innis Arden summarizes the expert findings by Kaczmar and Pignatello that establish, albeit circumstantially, a release from Barry Place. Innis Arden cites (1) the chemical fingerprinting of the PCBs and the experts' conclusions that the PCBs on both properties are the same, (2) the topography and drainage patterns which would permit the movement of PCBs down-gradient to Innis Arden from Barry Place, (3) the distribution of PCBs in the swale, pond, and wetland, and (4) the Pitney Bowes activities that could have caused such a release of PCBs. Thus, while Innis Arden elsewhere contends that it need not link its response costs to a particular Defendant, its own proffered evidence confirms the need for proof causally connecting Innis Arden's remediation efforts to a release of PCBs. Causation, in some form, is a critical issue in this case.

Innis Arden's state-law claims also have causation elements. Innis Arden asserts a claim pursuant to Connecticut General Statutes § 22a–452, which permits a private party to seek reimbursement from another "for the costs of environmental restoration for pollution resulting 'from the negligence or other actions of'" that other party, which the Connecticut Supreme Court has interpreted as "re-

quir[ing] a showing of culpability and not merely causation." *Conn. Resources Recovery Auth. v. Refuse Gardens, Inc.*, 229 Conn. 455, 642 A.2d 697, 698 (1994) (quoting § 22a–452(a)). The common-law nuisance and trespass claims have similar requirements. *See Pestey v. Cushman*, 259 Conn. 345, 788 A.2d 496, 507 (2002) (following the Restatement and conditioning recovery for nuisance on a plaintiff's "show[ing] that the defendant's conduct was the proximate cause of an unreasonable interference with the plaintiff's use and enjoyment of his or her property"); *City of Bristol v. Tilcon Minerals, Inc.*, 284 Conn. 55, 931 A.2d 237, 258 (2007) ("[I]in order to be liable for trespass, one must intentionally cause some substance or thing to enter upon another's land."). And the claim for equitable relief pursuant to Connecticut General Statutes § 22a–16, assuming for the moment that it is cognizable, authorizes civil actions seeking relief for "unreasonable pollution, impairment or destruction." *City of Waterbury v. Town of Washington*, 260 Conn. 506, 800 A.2d 1102, 1117 (2002). In short, if the CERCLA claim fails as a matter of law on causation grounds, so, too, do Innis Arden's state-law claims. *See FAG Bearings*, 846 F.Supp. at 1398.

## IV. *Daubert* Motions

Turning to the pending matters before the Court, the Defendants have moved to preclude Innis Arden's experts, Kaczmar and Pignatello, on the ground that their testimony is unreliable and thus inadmissible.

### A. Rule 702 Reliability

The discretion of this Court to admit expert testimony is governed principally by Rule 702, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of

fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Nimely v. New York,* 414 F.3d 381, 395 (2d Cir.2005). In *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court made clear that Rule 702 charges district courts with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

■ District courts may consider several factors in determining whether an expert's reasoning and methodology are reliable, including: (1) whether the theory or technique on which the expert relies "can be (and has been) tested"; (2) whether the expert's methodology "has been subjected to peer review and publication"; (3) the "known or potential rate of error" of the technique when applied; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether the theory or technique has been generally accepted in the scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. The test of reliability is a "flexible" one depending on the "nature of the issue, the expert's particular expertise, and the subject of his testimony"; no single factor will necessarily be determinative of the reliability of an expert's testimony, because the trial court need only "consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

As the 2000 advisory committee's notes indicate, an additional factor bearing on reliability is "[w]hether the expert has adequately accounted for obvious alternative explanations." Fed.R.Evid. 702 advisory committee's note; *see also United States v. Diaz,* 300 F.3d 66, 76 (1st Cir.2002) (affirming the admissibility of testimony where the experts "explained in detail the methods and principles they employed" and "articulated their bases for eliminating alternative explanations"); *Claar v. Burlington N. R.R. Co.,* 29 F.3d 499, 502 (9th Cir.1994) (affirming district court's determination that expert opinions were unreliable for failure "to rule out other possible causes for the injuries plaintiffs complain of, even though [the experts] admitted that this step would be standard procedure before arriving at a diagnosis"); *In re Rezulin Prods. Liability Litig.,* 369 F.Supp.2d 398, 420 & n. 137 (S.D.N.Y.2005) (noting that courts consider "whether the expert has accounted adequately for obvious alternative explanations"); *Casey v. Ohio Med. Prods.,* 877 F.Supp. 1380, 1385 (N.D.Cal.1995) (finding "case reports" to be unreliable because, among other things, they "do not isolate and exclude potentially alternative causes").

Furthermore, as the Supreme Court noted in *Daubert,* a "key question" to be resolved in determining whether expert testimony is sufficiently reliable is whether the expert's methods are testable and falsifiable. 509 U.S. at 593, 113 S.Ct. 2786. In some design-defect cases, for example, courts reject expert testimony based on proposed theories that have not been tested. *See, e.g., Zaremba v. General Motors Corp.,* 360 F.3d 355, 359 (2d Cir.2004) (affirming exclusion of expert's testimony based the fact that his method "has not been tested"). More generally, "[t]he hallmark of this reliability prong is the scientific method, *i.e.,* the generation of testable hypotheses that are then subjected to the

real world crucible of experimentation, falsification/validation, and replication." *Caraker v. Sandoz Pharm. Corp.*, 188 F.Supp.2d 1026, 1030 (N.D.Ill.2001); *see also Bauer v. Bayer A.G.*, 564 F.Supp.2d 365, 383 (M.D.Pa.2008) (following *Caraker* and finding that the challenged expert's opinion establishing causation "does not rest upon a reliable methodology").

■ The Court's "basic gatekeeping obligation," then, is "to 'ensure that any and all scientific testimony ... is not only relevant, but reliable.'" *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167 (quoting *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786). Just as it is within the Court's discretion to exclude expert testimony on reliability grounds, the Court enjoys "the same kind of latitude in deciding *how* to test an expert's reliability." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. In this case, the Court has sufficient evidence to assess the experts' reliability based on the extensive paper record and the oral argument held on May 20, 2009.

## B. Kaczmar's Testimony

■ Beginning with Kaczmar, his testimony suffers from two flaws that each independently render his opinions unreliable. First, he concluded that Pitney Bowes was responsible for the PCB contamination on Innis Arden's property without considering *any* other explanations, let alone the obvious alternative causes. In his deposition testimony, Kaczmar admitted that he did not consider whether other nearby industrial properties were a source of the PCBs on Innis Arden's property. Despite recognizing that Metro–North drainage flows through the same outfall as Barry Place, Kaczmar conducted no testing of Metro–North property. Indeed, OBG performed no sampling on any properties at all other than Barry Place, even though OBG's internal documents revealed that Innis Arden recognized that other

properties could be responsible for the PCBs. As the Court noted in the spoliation ruling, Innis Arden was concerned as early as mid–2005 about the possibility that the PCBs originated on other properties, and yet no testing or analysis was ever done to disprove that explanation. 257 F.R.D. at 336 & 340–41.

Kaczmar similarly recognized the potential relevance of date testing the PCBs found deep in the sediment, owing to the possibility that the PCBs might predate Pitney Bowes's occupancy of Barry Place. Radioisotope testing would have resolved this open question, but OBG never dated the soil samples. In Kaczmar's own words, he "did not work through the elimination of all properties" because his opinion was limited to analyzing the PCBs on Pitney Bowes's property. But at the same time, Kaczmar formed no opinion regarding where the PCBs on Barry Place originated, and his conclusions about precisely how the PCBs traveled to Innis Arden's property admittedly were based on insufficient evidence.

Returning to the governing causation standard discussed above, Innis Arden's burden is to link the PCBs on Pitney Bowes's property to the costs Innis Arden incurred in cleaning up the PCBS on its own property. Kaczmar's testimony does not reliably make this causal connection because he failed to confront, even in passing, the possibility that PCBs released from some other property caused Innis Arden's remediation costs. That another party could be responsible is not merely conjecture on Pitney Bowes's part: Innis Arden, its counsel, OBG personnel, and even Kaczmar understood that the evidence did not point only to Pitney Bowes. Yet no other possibility was ever explored. Having accounted for no other explanations other than the one he ultimately "proved," Kaczmar's methodology is not reliable.

The second flaw in Kaczmar's testimony is that his methods and opinions are not capable of being tested or verified. For one thing, he readily admitted in his deposition that he could not identify any particular analytical data he relied on in reaching his conclusions. His opinions as to the source of the PCBs on Innis Arden's property were primarily based on chemical fingerprinting—including his position that Pitney Bowes's expert, having disputed the identification of Aroclors found on the two properties, was incorrect—but Kaczmar could not point to any sample, chromatogram, or data pack that he considered.

On this point, the Defendants' *Daubert* motion interfaces with the matters decided in this Court's spoliation ruling and Magistrate Judge Margolis's sanctions ruling. Whether or not the Court was correct in its imposition of sanctions for failure to preserve evidence, it remains indisputable that the soil samples and full data packages no longer exist, which means that the Defendants could not attempt to validate Kaczmar's methods even if he could specifically say what he considered. And similarly, whether or not Innis Arden's conduct in discovery is sanctionable as Magistrate Judge Margolis found, the record shows that Innis Arden produced many documents, claimed to be relevant to Kaczmar's methodology, yet disclosed too late to be addressed through deposition questioning or to be properly considered by Pitney Bowes's expert. As Kaczmar revealed in his deposition, there is no way for the Defendants or the Court to know exactly how he reached his conclusions, and even if he had more fully explained his methodology, his results could not be replicated or verified because the underlying data is not available. With this hall-mark of reliability lacking, Kaczmar's testimony is inadmissible for this reason as well.

## C. Pignatello's Testimony

■ Pignatello's testimony, being premised on the same underlying data and constraints, are no more reliable. All of the concerns applicable to Kaczmar's methodology apply as well to Pignatello's—he relied only on the OBG testing data already found to be incomplete, he failed to consider other obvious explanations, and he could not specifically identify what data he considered. Moreover, Pignatello's approach was even more clearly flawed in one respect: he testified, supported by his engagement letter, that he was retained for the sole purpose of linking the PCB contamination to Pitney Bowes. An inquiry with a preordained conclusion is neither scientific nor legally reliable.

## D. Conclusion

The infirmities in Kaczmar's and Pignatello's expert opinions go well beyond being merely the stuff of cross-examination. At bottom, the experts' conclusions—by the experts' own admissions—were not the product of an open-minded search for the truth about the Innis Arden contamination. A scientific inquiry is one based on a "systematic pursuit" of knowledge through "testing and confirmation." Webster's Third New International Dictionary 2033 (Merriam–Webster 1993); *see also Daubert,* 509 U.S. at 593, 113 S.Ct. 2786 (offering various definitions of the scientific method). Kaczmar's opinions, being based on a process that was artificially narrow and confined to an incomplete set of data, are not scientifically valid. Pignatello's findings, which are essentially duplicative of Kaczmar's, fare no better.[2] To use the

---

2. The Defendants further seek to preclude the experts' testimony on the ground that Kaczmar and Pignatello lack the relevant education and experience necessary to provide reliable scientific conclusions. The Court rejects this argument. Simply because Kacz-

language of Rule 702, the opinions are neither "based on sufficient facts or data" nor "the product of reliable principles and methods." The testimony will not "assist the trier of fact to understand or determine" the "fact[s] in issue" in this matter. *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786. For all these reasons, Innis Arden's expert testimony is insufficiently reliable to be admissible in this case. Accordingly, the Court grants the Defendants' motions to preclude Kaczmar and Pignatello from testifying at trial.

### V. Motions for Summary Judgment and Remaining Matters

■ Coming finally to the Defendants' motions for summary judgment, the question of whether the record "show[s] that there is no genuine issue as to any material fact," Fed. R. Civ. P. 56(c), is a simple one. As part of its *prima facie* burden under § 107 of CERCLA, Innis Arden must establish a causal relationship between the costs it incurred in cleaning up its own property and the PCBs found on

Barry Place. 42 U.S.C. § 9607(a)(4); *Betkoski*, 99 F.3d at 514. According to Innis Arden's brief opposing summary judgment, its experts' conclusions provide this link: "IAGC's expert[s'] opinions clearly create an issue of fact concerning the issue of a release." (Pl.'s Mem. Opp'n [Doc. # 497] at 9.) Without the testimony of Kaczmar and Pignatello, Innis Arden cannot meet its burden. Therefore, because the Court has precluded Innis Arden's experts from testifying on reliability grounds, there is no triable issue on whether Innis Arden has carried its *prima facie* burden under § 107. And for the same reasons, in light of the various causation requirements discussed above, the failure of Innis Arden's CERCLA claim means that summary judgment must be granted on the state-law claims as well.[3]

The Court also overrules Innis Arden's objections to Magistrate Judge Margolis's sanctions ruling. Because the ruling was a determination of a non-dispositive discovery matter, this Court reviews the ruling according to the "clearly erroneous or con-

---

mar and Pignatello rendered unreliable opinions—based largely on constraints that, at least for Pignatello, were imposed by others—does not mean that they were not *qualified* to give expert testimony in this case on the subject of hazardous-waste contamination.

**3.** Although the Court concludes that summary judgment must enter in favor of the Defendants because Innis Arden has no admissible evidence of causation, there are other fatal flaws in Innis Arden's case.

As an element of its *prima facie* case under CERCLA, Innis Arden must show that its remediation efforts were "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B); 40 C.F.R. § 300.700(c)(2). Such federal compliance includes "provid[ing] an opportunity for public comment concerning the selection of the response action" in accordance with, for example, §§ 300.155 and 300.415(n) of the EPA regulations. 40 C.F.R. § 300.700(c)(6)(i)-(ii). The undisputed evidence shows that Innis Arden neither provided for public participation nor constructively involved the public though

comprehensive oversight by state authorities. Unlike the high level of state oversight found to be the functional equivalent of public participation in *Bedford Affiliates v. Sills*, 156 F.3d 416 (2d Cir.1998), OBG's remediation project for Innis Arden proceeded with minimal state involvement other than periodic updates. For this independent reason, Innis Arden's CERCLA claim fails as a matter of law. *Bedford Affiliates*, 156 F.3d at 428–29; *see also Carson Harbor Village v. County of Los Angeles*, 433 F.3d 1260, 1267–68 (9th Cir.2006) (holding that "minor and ministerial" state involvement "would not suffice to be an effective substitute for public participation").

In addition, whatever the nature of the causation standard under § 107 of CERCLA, Innis Arden has failed to offer evidence showing that the Defendants are sufficiently culpable for causing the contamination on its property such that the state-law claims can proceed to trial.

trary to law" standard. *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir.1990); Fed. R. Civ. P. 72(a) (implementing 28 U.S.C. § 636(b)(1)(A)). Reviewing Magistrate Judge Margolis's ruling according to that standard, the Court finds no clear error. The Court agrees with the conclusions she draws from the factual background of the discovery misconduct, and, given Magistrate Judge Margolis's close familiarity with the issues in this litigation, the Court finds that imposing monetary sanctions in the form of attorney's fees and costs was an entirely appropriate exercise of discretion.[4]

The last remaining motion, Innis Arden's motion for reconsideration of the spoliation ruling, is now moot. Whether or not the Court reconsiders its exclusion of the sampling and analytical evidence, Innis Arden's case fails due to the inadmissibility of its experts' testimony.

## VI. Conclusion

In summary, the Court disposes of the pending matters as follows. The Defendants' motions to preclude Innis Arden's experts [Doc. ## 422, 423] and motions for summary judgment [Doc. ## 458, 471] are granted. Innis Arden's objections [Doc. # 526] to Magistrate Judge Margolis's sanctions ruling are overruled, and that ruling [Doc. # 521] is approved and adopted. Innis Arden's motion for consideration of a reply brief [Doc. # 528] is granted, but its motion for reconsideration [Doc. # 518] is found moot.

The Clerk is directed to close this case.

IT IS SO ORDERED.

---

4. Given that the Court is granting summary judgment to the Defendants, Magistrate Judge Margolis will have no need to reconsider imposition of more severe sanctions. The potential for reconsideration she references (Sanctions Ruling at 14) does not change this Court's standard of review, contrary to Innis Arden's assertion.